## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| | **Case No. 15-cr-40053-01-DDC** |
| **v.** | |
| **BRIAN ALLEN TOLBERT (01),** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Brian Allen Tolbert's Motion to

Suppress Evidence (Doc. 44).  The government responded to Mr. Tolbert's motion (Doc. 53),

and Mr. Tolbert submitted a Reply (Doc. 56).  The court conducted an evidentiary hearing on

July 5, 2016.  After the hearing, Mr. Tolbert submitted a "Post-Hearing Brief" (Doc. 60), and the

government responded with a "Post-Hearing Response" (Doc. 65).  After carefully considering

the evidence and the parties' submissions, the court denies Mr. Tolbert's motion.

### I.    Factual Background

Officer Willie Wilkins of the Topeka Police Department ("TPD") testified at the July 5,

2016 evidentiary hearing about his involvement with a narcotics investigation in February 2015.

Officer Wilkins worked with a confidential informant, identified as "N215," in that narcotics

investigation.  N215 previously had admitted to possessing illegal narcotics, a misdemeanor

violation.  In exchange for clemency on the misdemeanor charge, N215 offered to provide

information to the TPD about individuals who had sold her illegal narcotics.  Officer Wilkins

does not know of any prior criminal history for N215.

N215 provided the TPD with the names of two individuals who she claimed had sold her illegal narcotics.  N215 then worked with TPD officers to arrange controlled purchases with those two individuals.  Officer Wilkins testified that the TPD procedure for conducting controlled purchases involves providing funds to a confidential informant (or, in some cases, an undercover officer).  The confidential informant then uses those funds to purchase illegal narcotics in a controlled setting.  TPD officers search the confidential informant before the controlled purchase to ensure that she has no illegal substances or money in her possession.  TPD officers also keep the confidential informant under surveillance during the purchase.  And then they search the confidential informant again after she has returned to the officers and provided the contraband that she purchased.

The first individual that N215 identified as a person who sold her illegal narcotics was Eric Lira.  N215 worked with TPD officers to arrange controlled purchases from Eric Lira on three separate occasions.  With each of the three controlled purchases, N215 purchased a substance from Mr. Lira that tested positive for illegal narcotics.  Those purchases have resulted in criminal charges filed against Mr. Lira.

The second individual that N215 identified was someone she knew as "Brian T."  As she had done with Mr. Lira, N215 also worked with the TPD to arrange controlled purchases from Brian T.  N215 set up the first one on February 11, 2015.  N215 contacted Brian T. by cell phone.  N215 arranged a time and place for them to meet and agreed on the amount of narcotics that she wished to purchase.  Before the meeting with Brian T., TPD officers searched N215's person and vehicle to ensure that she did not have any contraband already in her possession.  TPD officers then provided N215 with sufficient funds to purchase the narcotics.  Afterwards, N215 waited in her vehicle in a parking lot at the intersection of 10th and Gage in Topeka,

Kansas.  A blue Dodge Charger drove into the parking lot, and its occupant made an exchange with N215.  Afterwards, N215 returned to TPD officers.  The TPD officers had been surveilling the entirety of the controlled purchase, beginning from their search of N215's person and vehicle before the purchase and ending when she returned to the officers after the purchase.  The officers then searched N215 and her vehicle again, and they collected the substance that N215 had purchased during the controlled buy.  The substance tested positive for marijuana.

During the controlled purchase, TPD officers recorded the blue Dodge Charger's license plate number.  It displayed a Kansas license plate with number 854GGP.  Officer Wilkins ran the tag number and learned it was registered to a Brian Allen Tolbert.  Officer Wilkins also verified that Mr. Tolbert worked at a Subway restaurant on Southwest Topeka Boulevard, consistent with information that N215 had provided.

Officer Wilkins also checked the Shawnee County databases for information about Mr. Tolbert.  He used the AS400 database maintained by the Shawnee County Department of Corrections.  The AS400 database collects photographs and information about individuals who are booked into the Shawnee County jail as well as individuals who are registered offenders. The database returned a mugshot of Mr. Tolbert.  Officer Wilkins was not able to tell from the mugshot whether it was included in the database because of a prior detention in the Shawnee County jail or from a prior offender registration.  He since has learned that the picture is a registered offender profile.  Officer Wilkins showed the mugshot to N215.  N215 recognized the individual in the mugshot as Brian T, the person who had sold her marijuana.

The AS400 database also returned an address for Mr. Tolbert.  Officer Wilkins surveilled that addresses for one or two days, and he saw the blue Dodge Charger with Kansas license plate number 854GGP parked at the residence.

On February 17, 2015, TPD officers conducted a second controlled purchase with N215 and Mr. Tolbert, following the same procedure they used for the first purchase. N215 contacted Mr. Tolbert by cell phone and arranged a time and place to meet him. N215 also confirmed the amount of narcotics that she would purchase. Before the meeting, TPD officers searched N215's person and her vehicle for contraband. After finding none, they provided N215 with funds to purchase the narcotics. TPD officers then followed N215 to a parking lot where she had agreed to meet Mr. Tolbert. TPD officers saw Mr. Tolbert arrive in a white Ford Edge and make an exchange with N215. Afterwards, N215 returned to the officers. The officers searched N215's person and car again. N215 provided the substance she had purchased from Mr. Tolbert to the TPD officers. The substance tested positive for marijuana. TPD officers had kept N215 under surveillance from the time that they searched her person and vehicle before making the purchase until she returned to the officers after the purchase.

Officer Wilkins recorded the license plate number of the white Ford Edge. After running the tag number, he determined that the white Ford Edge was registered to a woman with a Topeka address. TPD officers learned through their investigation that the owner of the Ford Edge was Mr. Tolbert's girlfriend.

TPD officers conducted a third controlled buy between N215 and Mr. Tolbert, on April 29, 2015. They followed the same procedures as they had with the first two controlled purchases. N215 contacted Mr. Tolbert to arrange a time and place to meet. N215 also discussed amounts and pricing with Mr. Tolbert before the purchase. TPD officers searched N215 and her vehicle before the purchase, and they provided her money to purchase the illegal narcotics. N215 again met Mr. Tolbert in a parking lot, where they completed the transaction.

During this controlled purchase, Officer Wilkins specifically saw Mr. Tolbert's face and identified him as the individual involved with the third controlled purchase to N215.

After the controlled purchase, N215 returned to meet the TPD officers. The officers searched N215 and her vehicle, and she provided them the substance she had purchased from Mr. Tolbert. It tested positive for marijuana. Like the other controlled buys, TPD officers kept N215 under surveillance from the time they searched her person and vehicle before the controlled buy until she returned to the TPD officers after the purchase.

Mr. Tolbert denies that he was involved in any of the three controlled purchases. He testified at the July 5, 2016 evidentiary hearing that, on the date of the first controlled buy, he was completing school work because he had class to attend the next day. During the second controlled buy, Mr. Tolbert believes he was getting ready to attend class in the evening. And, during the third controlled buy, he believes he was doing homework or getting ready to go to class.

Mr. Tolbert attached his telephone records as an exhibit to his Motion to Suppress. *See* Doc. 44-1 at 26–34. At the evidentiary hearing, the government showed those records to Officer Wilkins. Officer Wilkins testified that he was familiar with N215's telephone number—the last four digits of which are 7197. Mr. Tolbert's telephone records show a telephone call made to N215's number at 6:39 p.m. on February 11, 2015—the date of the first controlled buy. Officer Wilkins testified that the first controlled buy took place around 7:00 p.m. The telephone records also show text messages sent to and received from N215's telephone number on February 11, 2015. The messages occurred between 7:03 a.m. and 7:14 a.m., between 3:28 p.m. and 3:38 p.m., and between 4:17 p.m. and 4:34 p.m., on February 11, 2015.

Mr. Tolbert's telephone records also show text message correspondence with N215's number on February 17, 2015—the date of the second controlled purchase.  The records identify 16 text messages sent to or from N215's number between 10:14 a.m. and 2:36 p.m., on February 17, 2015.  Officer Wilkins testified that the second controlled purchase occurred around 4:50 p.m. on February 17, 2015.

Mr. Tolbert's telephone records also show a telephone call made to N215's number at 2:23 p.m. on April 29, 2015—the date of the third controlled buy.  Officer Wilkins testified that the third controlled purchase occurred around 2:44 p.m.  The telephone records also list nine text messages sent to or from N215's telephone number on April 29, 2015, between 8:09 a.m. and 12:15 p.m.

When setting up the controlled purchases, Officer Wilkins did not monitor N215's communications with Mr. Tolbert to arrange the sale.  He neither observed phone calls between N215 and Mr. Tolbert nor reviewed text messages that they exchanged.  He also did not review phone records when the controlled buys were occurring.

After the three controlled purchases with Mr. Tolbert, Officer Wilkins prepared an affidavit to use as part of making a request for a search warrant.  It sought to search:  (1) Mr. Tolbert's person; (2) the addresses with which he was associated and where TPD officers had observed him entering before the controlled purchases; and (3) the vehicles that he had driven when he made the controlled buys (the Dodge Charger and the Ford Edge).  Officer Wilkins also requested that the search warrant include a "no knock" exception.  In support of this request, Officer Wilkins stated that Mr. Tolbert's criminal history included at least two offenses involving use of a firearm.  Officer Wilkins obtained this information from the National Crime Information Center ("NCIC").  NCIC returned information showing that one of the firearm

offenses involved Mr. Tolbert's arrest for first-degree felony homicide in a juvenile matter.

Officer Wilkins also stated in the affidavit that Mr. Tolbert's extensive narcotics and weapons

history justified a "no knock" search warrant.

On May 1, 2015, a Shawnee County, Kansas District Judge issued two search warrants

authorizing the TPD to search the places that Officer Wilkins had designated in his application.

The search warrants authorized seizure of:

> Marijuana, drug paraphernalia, and any documentation associated with the sale and distribution of illegal drugs;
>
> Any and all documents, books, records, receipts, notes, ledgers, US currency, money orders and or wire transfer receipts, rental agreements, and other papers relating to the transportation, ordering, possession, sale and distribution of controlled substances. Any documents, letters or records indicating the owner and or controlling party of said property. Any documents letters or records indicating ownership of real estate, bank accounts, vehicles, firearms, weapons, any communication device's i.e. cellular telephones and their contents and components to include but not limited to any and all information stored in or accessible by the communication devices to include but not limited to contact information, stored phone numbers, call records of incoming, outgoing and missed calls, text messages and photographs.

Doc. 44-2 at 2, 6. Officer Wilkins then assembled teams of TPD officers to execute the search

warrants.

A team of TPD officers executed the search warrant on the Dodge Charger at Mr.

Tolbert's place of employment—the Subway restaurant. As Mr. Tolbert left work, TPD officers

arrested him. The officers placed handcuffs on Mr. Tolbert and put him in the backseat of a

police car. TPD Officer Soto then conducted an initial search of the vehicle in the Subway

parking lot. Mr. Tolbert testified at the evidentiary hearing that, from his position in the backseat

of the police car, he saw about three officers searching the inside of his car and the trunk. Mr.

Tolbert saw the officers open all the doors to the vehicle during the search, but he was unable to

see if they searched any packages or compartments inside the vehicle.  Mr. Tolbert watched the officers search the car for about 15 minutes.

After searching the car in the Subway parking lot, TPD officers moved the Dodge Charger to the TPD Law Enforcement Center so that a dog could sniff the vehicle for contraband.  The dog was not available to perform a sniff in the Subway parking lot because the dog's handler was not on duty at the time.  Officer Wilkins testified that a dog sniff is a standard tactic that the TPD employs when conducting vehicle searches in connection with a narcotics investigation.  He also testified that his plan for executing the search warrant always included a dog sniff of the vehicle.

When the dog and handler were available, they performed the sniff at the Law Enforcement Center.  The dog alerted to contraband in the Dodge Charger.  TPD officers then removed portions of the dash to search for contraband.  To remove the dash, officers used tools and services from the Fleet Department that were available at the Law Enforcement Center but not in the Subway parking lot.  After removing the portions of the dash, TPD officers eventually located about $2,900 in U.S. currency in an envelope labeled with Mr. Tolbert's name and a firearm.  TPD officers found the currency and firearm inside the lower dash on the driver's side of the Dodge Charger.

The government has charged Mr. Tolbert with unlawfully possessing a firearm as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  The charge arises from the firearm that the TPD officers discovered during the search of the Dodge Charger.

## II.    Analysis

Mr. Tolbert moves to suppress the currency and firearm that the TPD officers located in the Dodge Charger because, he contends, the search and seizure violated his rights under the

Fourth Amendment.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Generally, a search is per se unreasonable unless law enforcement secures a warrant based on probable cause.  *See id.*; *Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." (citation and internal quotation marks omitted)).

Mr. Tolbert challenges the reasonableness of the TPD's search and seizure on several grounds.  First, he asserts that the state court judge issued the warrants based on false information or information that was presented with reckless disregard for the truth, and thus no probable cause existed to issue the warrants.  Second, Mr. Tolbert argues that the warrants did not authorize the seizure of firearms, and thus the TPD's seizure of the firearm that officers found in the Dodge Charger is invalid.  Finally, Mr. Tolbert contends that the warrants did not authorize the TPD to transport the Dodge Charger from the Subway parking lot to the Law Enforcement Center.  He thus contends that the TPD's seizure and transportation of the car constituted an unreasonable seizure in violation of the Fourth Amendment.  The court addresses each argument, in turn, below.  But it finds that none support suppression of the evidence.

### A.  Probable Cause Existed to Support Issuance of the Warrants.

Mr. Tolbert asserts that the affidavit prepared by Officer Wilkins to obtain the search warrants contains deliberately false and misleading statements or omissions or statements or omissions made with reckless disregard of the truth.  He thus contends that no probable cause existed to issue the search warrants.  The court disagrees for the reasons explained below.

When determining the sufficiency of an affidavit upon which a warrant is issued, the court examines "the totality of the circumstances and simply ensur[es] 'that the [issuing] magistrate had a substantial basis for concluding that probable cause existed.'" *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)). Probable cause exists when "'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. at 238). In its analysis, the court gives "'great deference' to the issuing magistrate judge's [probable cause] decision." *United States v. Kennedy*, 131 F.3d 1371, 1375 (10th Cir. 1997) (quoting *United States v. Cusumano*, 83 F.3d 1247, 1250 (10th Cir. 1996)).

The Fourth Amendment is violated when an affiant "knowingly and intentionally, or with reckless disregard for the truth, make[s] a false statement in an affidavit." *United States v. Basham*, 268 F.3d 1199, 1204 (10th Cir. 2001) (citing *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978)). When an affidavit for a search warrant contains a false statement, the search warrant is void if the remaining information fails to establish probable cause. *Id.* (citing *Franks*, 438 U.S. at 171–72).

To establish a Fourth Amendment violation under *Franks* requiring suppression of evidence, a defendant must make "a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *Kennedy*, 131 F.3d at 1376 (citing *Franks*, 438 U.S. at 155–56 (further citation omitted)). If a defendant satisfies that requirement, the court holds an evidentiary hearing where defendant must establish "by a preponderance of the evidence that the false statement was included in the affidavit by the affiant 'knowingly and intentionally, or with reckless disregard for the truth,' and the false statement was 'necessary to the finding of probable

10

cause.'" *Id.* (quoting *Franks*, 438 U.S. at 155–56).  If defendant makes that showing, "'the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *Id.* (quoting *Franks*, 438 U.S. at 155 – 56).  In our Circuit, "the standards of 'deliberate falsehood' and 'reckless disregard' set forth in *Franks* apply 'to material omissions, as well as affirmative falsehoods.'" *Id.* (quoting *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990)).

Mr. Tolbert asserts several reasons for why Officer Wilkins' affidavit contains deliberately false and misleading statements, or statements made with reckless disregard for the truth, as well as omissions.  The court addresses each argument below and concludes that none of Mr. Tolbert's arguments establish that Officer Wilkins' affidavit contains material false statements or omissions.  Mr. Tolbert thus cannot make the requisite showing for a *Franks* hearing.

*First,* Mr. Tolbert challenges the reliability of N215.  But this line of attack never identifies any false or misleading statements or material omissions about N215's reliability in the affidavit.  The affidavit states that N215 provided information about narcotic activity to the TPD in exchange for "consideration of charges" if the information she provides proves true and accurate.  Doc. 44-1 at 16.  It also states that N215 has no known convictions for crimes of dishonesty.  This information is consistent with Officer Wilkins' testimony at the evidentiary hearing.  Though Mr. Tolbert complains that the affidavit does not provide more information about the charges N215 was facing that led her to cooperate with the TPD, that omission is not a material one.  Officer Wilkins testified that N215 had admitted to possessing illegal narcotics, a misdemeanor violation.  This is not a criminal charge involving dishonesty or one that could raise concerns about N215's reliability.

11

The affidavit also describes N215's involvement in at least six controlled purchases of illegal narcotics under the TPD's direction.  Mr. Tolbert complains that the affidavit fails to include information stating whether the controlled purchases were successful or whether they led to the prosecution of anyone else.  These omissions also are not material ones.  Officer Wilkins testified about other successful controlled purchases completed by N215.  He also stated that Eric Lira (the other individual identified by N215 as someone who sold her illegal narcotics) is facing criminal charges based on the controlled buys that N215 arranged with him.  The additional information provided by Officer Wilkins at the evidentiary hearing only strengthens the information provided in the search warrant application.

Mr. Tolbert also asserts that the affidavit lacks information about the basis of N215's familiarity with marijuana.  But he fails to explain how this is a material omission necessary to the probable cause determination.  Mr. Tolbert has not shouldered his burden under *Franks* to establish that the affidavit contains intentional or reckless false statements or material omissions about N215's reliability.

*Second*, Mr. Tolbert challenges N215's positive identification of him from a "Shawnee County Department of Corrections Booking Photo."  Doc. 44-1 at 18.  He contends this is a false statement because he was never in the custody of the Shawnee County Department of Corrections until he was arrested in this case.  Thus, he asserts that no such booking photo could exist.  But Officer Wilkins testified at the evidentiary hearing that he obtained Mr. Tolbert's mugshot from the AS400 database which collects photographs and information about individuals who are booked into the Shawnee County jail as well as individuals who are registered offenders. When he first obtained the photo, Officer Wilkins was not able to tell whether it was included in the database because of a prior detention in the Shawnee County jail or because of a prior

offender registration entry.  But he has learned since then that Mr. Tolbert's mugshot is a registered offender profile.  Though Officer Wilkins mistakenly referred to the mugshot as a "booking photo" in the affidavit, his testimony establishes that this was not an intentional or reckless false statement.  And, even if it were, the affidavit, when purged of its falsities, still suffices to support a finding of probable cause.  If the reference to "booking photo" is removed from the affidavit, the remaining information—that N215 positively identified Mr. Tolbert from a mugshot—is not a false statement.

*Third*, Mr. Tolbert argues that the affidavit contains false information about N215's contact with Mr. Tolbert through his cell phone.  In support of this argument, Mr. Tolbert submitted his phone records.  He contends that the records show no communication between Mr. Tolbert and N215.  But Officer Wilkins dispelled this theory at the evidentiary hearing.  He testified that he was familiar with N215's phone number.  And he identified multiple phone calls and text messages either from or to N215's phone number on Mr. Tolbert's phone records, specifically on the three dates of the controlled buys.  Mr. Tolbert thus has failed to establish that the information about N215's cell phone communications with Mr. Tolbert was false or misleading.

*Fourth*, Mr. Tolbert asserts that the affidavit contains a material omission because it does not explain the pricing discrepancies for the controlled buys.  Officer Wilkins testified that N215 bought about 4.75 grams of marijuana for $60 in the first controlled purchase and about 9.4 grams of marijuana for $80 in the second controlled purchase.  He also testified that the TPD did not test the marijuana to determine its grade or quality.  Mr. Tolbert has presented no evidence showing that the reason for pricing discrepancies was based on something that would negate a probable cause finding.  Instead, as the government suggested at the hearing, one could attribute

the pricing discrepancies to the quality of the product or even something as generic as the principle of supply and demand. Without more, this arguments does not establish that the affidavit's failure to explain the pricing differences was a material omission.

*Fifth*, Mr. Tolbert asserts that the affidavit contains false or misleading information about the TPD's surveillance of him and the controlled buys. The affidavit states that TPD Officer Jason Schumacher observed Mr. Tolbert leaving a residence before a controlled buy and followed him from that residence to the predetermined location where he met N215 for the controlled purchase. But the affidavit also states that Officer Schumacher kept N215 under constant surveillance during the controlled buy. Officer Wilkins testified that this conflicting information was an inadvertent error on his part. Officer Wilkins testified that, contrary to the information in the affidavit, he observed N215 and kept her under constant physical surveillance during the controlled purchase, not Officer Schumacher. And he explained that Officer Schumacher conducted surveillance of Mr. Tolbert on the day of the third controlled purchase.

Officer Schumacher also testified at the evidentiary hearing. He confirmed that he kept Mr. Tolbert under physical surveillance on April 29, 2015, the date of the third controlled buy. He said that he observed him at a residence and then followed him from the residence to the parking lot where he met N215 for the purchase. Officer Schumacher also confirmed that Officer Wilkins and another officer kept N215 under surveillance during the third controlled purchase. He agreed that the information in the affidavit was incorrect because it was Officer Wilkins, not Officer Schumacher, who kept N215 under surveillance during the third controlled buy.

Based on the testimony at the evidentiary hearing, the court concludes that the affidavit's inaccurate information about Officer Schumacher's surveillance of N215 was not an intentional

or reckless statement.  Instead, Officer Wilkins made a human error when he identified the officer who surveilled N215 during the controlled purchase.  And, even if he had made this false statement intentionally or recklessly, the affidavit, when purged of its falsities, still supports a probable cause finding.  Moreover, had the affidavit cited the correct information, it would have established that two different TPD officers surveilled Mr. Tolbert and N215 separately on the day of the third controlled purchase.  Both witnessed Mr. Tolbert meeting N215 for the controlled purchase—a fact supporting the probable cause finding.

*Sixth*, Mr. Tolbert contends that the affidavit contains inaccurate information about his criminal history to support Officer Wilkins' request for a "no knock" warrant.  The court disagrees.  Officer Wilkins testified that he obtained information about Mr. Tolbert's criminal history from NCIC.  Officer Wilkins accurately reported that information in the affidavit.  NCIC reported that Mr. Tolbert was involved in at least two offenses involving a firearm.  One of these offenses was an arrest for first-degree felony homicide in a juvenile matter.  NCIC also reported that Mr. Tolbert has been arrested, charged, or convicted on multiple drug offenses involving different types of drugs including marijuana, cocaine, and methamphetamine.  Based on the information that Officer Wilkins obtained from NCIC, his statement that Mr. Tolbert had an extensive narcotics and weapons history was not false or misleading or made in reckless disregard for the truth.  And, even if it were, the remaining information in the affidavit supports probable cause to issue the warrants and does not require suppression of the evidence.  *See Hudson v. Michigan*, 547 U.S. 586, 592–94 (2006) (holding that the remedy for a violation of the knock-and-announce rule does not include suppression of evidence).

For all these reasons, Mr. Tolbert has failed to establish that Officer Wilkins' affidavit contained intentional or reckless false statements that render the warrants void for lack of

probable cause.  But, even if Mr. Tolbert could make this showing, the government argues that the good faith exception to the exclusionary rule applies here.  In *United States v. Leon*, the Supreme Court held that the Fourth Amendment's exclusionary rule does not apply when an officer conducts a search "in objectively reasonable reliance on a subsequently invalidated search warrant."  468 U.S. 897, 922 (1984).  The Supreme Court reasoned that the exclusionary rule seeks to deter police misconduct rather than judicial mistakes, and so courts should invoke the rule only in circumstances where it serves to accomplish that goal.  *Id.* at 918–21.  According to the Supreme Court, that means "suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."  *Id.* at 926

Here, the court finds no evidence of police misconduct that would preclude application of the good faith exception.  Officer Wilkins was not dishonest or reckless when he prepared the search warrant affidavit.  Though his affidavit contains a few minor inadvertent errors, they are not materially false or reckless statements or omissions.  And, as the government argues, the correct information only strengthens probable cause to support the issuance of the warrants.  Thus, even if no probable cause existed to support the warrants, the good faith exception would apply here and preclude suppression of the evidence.

### B.  The TPD Lawfully Seized the Firearm.

Mr. Tolbert next asserts that the government's seizure of the firearm exceeded the scope of the search warrant, and thus the court must suppress that evidence.  The Fourth Amendment requires search warrants to "particularly describe the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.;  *see also United States v. Leahy*, 47 F.3d 396, 397 (10th Cir. 1995).  "The particularity requirement ensures that a search is confined in scope to

16

particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *Leahy*, 47 F.3d at 397.

Mr. Tolbert argues that the search warrants only allowed law enforcement to search and seize documents showing ownership of firearms—but not the firearms themselves. The search warrants specifically authorized seizure of:

> [a]ny documents letters or records indicating ownership of real estate, bank accounts, vehicles, firearms, weapons, any communication device's i.e. cellular telephones and their contents and components to include but not limited to any and all information stored in or accessible by the communication devices to include but not limited to contact information, stored phone numbers, call records of incoming, outgoing and missed calls, text messages and photographs.

Doc. 44-2 at 2, 6. Mr. Tolbert asserts that the phrase "[a]ll documents letters or records indicating ownership" modifies the entire list of items that follow, including "firearms." Thus, he contends, the search warrants only authorized the seizure of documents demonstrating ownership of a firearm, not an actual firearm.

The government responds that the "[a]ll documents" phrase does not modify the entire list of items. It contends that the modifier ceased earlier in the sentence because, otherwise, it makes no sense in the context of cellular telephone detail. The government argues, for example, that the "[a]ll documents" phrase does not apply to the "call records of incoming, outgoing, and missed calls" because the seizure of documents showing ownership of call records is nonsensical. Instead, the government asserts, the officers would have reasonably understood the warrants to allow for the seizure of call records. The government also argues that the officers would have reasonably understood the warrants to allow for the seizure of the firearm.

Although the warrants are not models of drafting clarity, the court need not parse through the warrants' language to determine whether they allowed seizure of the firearm. Instead, the

plain view exception to the warrant requirement authorized the officers to seize the firearm they found in Mr. Tolbert's car.  Agents or officers may seize evidence without a warrant if the evidence is in "plain view."  *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).  Evidence is admissible under the plain-view doctrine if:  (1) the officer was lawfully in a position from which to view the item seized while in plain view; (2) the item's incriminating character was "immediately apparent[;]" and (3) the officer had a lawful right of access to the item itself. *Horton v. California*, 496 U.S. 128, 136–37 (1990).

All three requirements are satisfied here.  First, the TPD officers were in a lawful position when they viewed the firearm.  One of the two warrants gave the officers authority to search the Dodge Charger.  This authority included any part of the vehicle that might contain the items they were searching to find, such as drugs, documents, or currency.  *See United States v. Ross*, 456 U.S. 798, 825 (1982) (explaining that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").  The TPD officers found the firearm inside the dash during the search of the Dodge Charger.  That was an area of the car that could contain objects that the warrant authorized the officers to seize.  The TPD officers thus viewed the firearm from a lawful position.

Second, the firearm's incriminating character was immediately apparent.  The TPD knew that Mr. Tolbert had a prior felony conviction.  Indeed, Officer Wilkins had included that information in the warrant application.  This felony conviction prohibited Mr. Tolbert from possessing a firearm.  And, thus, the incriminating character of the firearm was immediately apparent.

Third, the officers had a lawful right of access to the firearm because the warrant authorized their search of the Dodge Charger and any compartments that could contain drugs, documents, and currency.[1]  The officers thus had a lawful right of access to the firearm when they found it inside the dash of the Dodge Charger during the search authorized by the warrant.

Even if the warrants did not allow seizure of the firearm, TPD officers had authority to seize the firearm under the plain view doctrine.  So the seizure of the firearm is not a Fourth Amendment violation.

## C.  No Fourth Amendment Violation Occurred When the TPD Transported the Dodge Charger to the Law Enforcement Center.

Last, Mr. Tolbert asserts that the TPD violated the Fourth Amendment by seizing the Dodge Charger and moving it to the Law Enforcement Center.  Mr. Tolbert argues that the warrant allowed the officers to search the vehicle only once.  He contends that they performed that search in the Subway parking lot, and the warrant did not authorize them to transport the Dodge Charger to the Law Enforcement Center to perform—what he calls—a second search of the vehicle.

Mr. Tolbert argues the officers fully executed the search warrant in the Subway parking lot and so, the warrant for the vehicle had expired and the TPD was required to cease searching. *See United States v. Gagnon*, 635 F.2d 766, 769 (10th Cir. 1981) (explaining that "once a search warrant has been fully executed and the fruits of the search secured, the authority under the warrant expires and further governmental intrusion must cease" (citations omitted)).  But the government responds that the officers had not yet completed their search of the Dodge Charger when they moved it from the Subway parking lot to the Law Enforcement Center.  Instead, the

---

[1]      As explained in more detail below, the officers had a lawful right to access the firearm during their search of the Dodge Charger at the Law Enforcement Center.  The court rejects Mr. Tolbert's argument that officers violated the Fourth Amendment by moving the vehicle from the Subway parking lot to the Law Enforcement Center for a continued search of the vehicle for contraband.

government contends, the officers conducted an initial search of the vehicle in the Subway

parking lot.  The officers then moved the vehicle to the Law Enforcement Center to continue

their search of the car because, there, they had access to a drug-sniffing dog and tools to assist

them with completing the search of the vehicle, including the tools that they used to remove

portions of the dash.  The government argues that the officers' movement of the Dodge Charger

to the Law Enforcement Center for this purpose was reasonable under the Fourth Amendment.

The court agrees.

In the context of warrantless searches, the Supreme Court has held that it is not

unreasonable for officers to move a vehicle to a location that is more conducive for conducting a

search.  *See Chambers v. Maroney*, 399 U.S. 42, 52 n.10 (1970) (holding that it was not

unreasonable for officers with probable cause to move the car to the police station to search it

because "[a] careful search . . . was impractical and perhaps not safe for the officers [where it

was], and it would serve the owner's convenience and safety of his car to have the vehicle and

the keys together at the station house"); *see also United States v. Tapia*, No. 09-3060, 2010 WL

299245, at *5 (10th Cir. Jan. 27, 2010) (holding that officers with probable cause to search a car

at the scene where it is stopped also may perform the search later at the station house); *United

States v. Anderson*, 114 F.3d 1059, 1065–66 (10th Cir. 1997) (holding that no Fourth

Amendment violation occurred because officers had probable cause to search the vehicle and it

thus was lawful for officers to transport the vehicle to highway patrol headquarters for a search

instead of searching the vehicle on the roadside where it was stopped).

Here, the officers had probable cause to search the vehicle based on a warrant.  TPD

officers executed the warrant at the Subway parking lot.  There, three TPD officers searched the

car for about 15 minutes.  Though Mr. Tolbert argues that this constituted a thorough search and

20

so the warrant expired at the end of this search, the government has established that this effort was just an initial search of the vehicle. Thus, the search at the Law Enforcement Center was not a second search, as Mr. Tolbert contends. It was, instead, a continuation of the first search that the warrant authorized. Two reasons support the court's finding that law enforcement conducted one search.

First, at the Law Enforcement Center, the officers had access to more favorable conditions for searching, including a drug-sniffing dog once it was available for duty. Officer Wilkins testified that a dog sniff is a standard tactic that the TPD employs when conducting vehicle searches as part of a narcotics investigation. While he conceded that a dog sniff is not required to perform a complete search of a car, Officer Wilkins also testified credibly that his plan for executing the search warrant always included a dog sniff of the vehicle. Because the dog was not available to perform the sniff in the Subway parking lot, it was reasonable for the officers to move the car to the Law Enforcement Center so that the dog sniff could occur once the dog was available to do so.

Second, the officers had access to the Fleet Department's tools and services at the Law Enforcement Center, but not in the Subway parking lot. The officers used those tools and services to remove portions of the dash, allowing them to find the firearm and currency inside that area of the car. Transporting the vehicle for that purpose also was reasonable under the Fourth Amendment.

The facts establish that the officers' decision to relocate the Dodge Charger to the Law Enforcement Center to continue their search was a reasonable one. The evidence establishes that the officers moved the vehicle to that location so they would have access to the drug-sniffing dog and tools that allowed them to access areas of the car that may contain drugs or other contraband,

including the dash areas where the officers eventually located the firearm and currency.  No Fourth Amendment violation occurred here.

III.      **Conclusion**

For the reasons explained above, the court denies Mr. Tolbert's motion to suppress.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Brian Allen Tolbert's Motion to Suppress Evidence (Doc. 44) is denied.

**IT IS SO ORDERED.**

**Dated this 26th day of August, 2016, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**